her feminine traits, didn't like them, created rules for her to follow, to make her more masculine and follow those masculine gender roles more closely, and that when she broke those rules, quote, in response to respondents' disobedience, end quote, the uncle would beat her as much as six times a week. The IJ also found, as a matter of fact, that Kelly's principal told her that she couldn't come back to school unless she cut her hair and dressed like a man, again, quote, dressed like a man. All of that is on required short appendix page nine. Nevertheless, the BIA found that her status as an LGBT individual was not one central reason for her past persecution. And despite unrebutted evidence that one of the chief persecutors of LGBT people in Honduras are the police and security forces, the BIA found that one, I'm sorry, that the government was able and willing to control that persecution and that Kelly did not have a well-founded fear of future persecution. I'd like to discuss all three of those findings in a little bit more detail this morning as they do not comport with the substantial evidence of the record considered as a whole. First, I'd like to talk a little bit about what's not at issue in this case. Kelly, the BIA's analysis assumes that Kelly's testimony was credible, that Kelly is credible. It also assumes that Kelly was persecuted in the past. It also assumes that Kelly is a member of at least two particular social groups, LGBT children without parental protection and transgender women. So I'd like to start by talking about the IJ's finding that Kelly's LGBT status was not one central reason for her past persecution. In spite of those findings that... Well, maybe this is not what you were going to say, but why is that even pertinent since the BIA did not decide, did not adopt that part of the IJ's reasoning for the past persecution? The BIA did adopt the part of the reasoning about one central reason. In other words, why was Kelly persecuted was one central motivation of her persecutors, her LGBT status. The BIA did adopt that part of the opinion. And that is not supported by substantial evidence. There are basically three ways to tell a persecutor's motivation. And all three of them in this instance point to the one central reason being Kelly's LGBT status. The first, and what this court's opinion in Carkey says can be a dispositive reason, are the words that persecutors use. In this case, her uncle used slurs against LGBT people as he beat her. He told her he was beating her to, quote, make her a man. And the principal told her she was not being allowed to go to school because she, quote, dressed like a man. This is a public school principal. So those words could be dispositive, honestly. But there's more. There's also evidence of the circumstances surrounding the abuse, particularly the uncle's abuse. The uncle made rules, clearly noted her feminine traits, clearly was bothered by them, made rules about not watching soap operas, not hanging out with girls, beat her more when Kelly would wear her sister's clothing, would beat Kelly's sister when Kelly's sister tried to intervene and protect Kelly during these attacks. All of those circumstances and more that are in the record and discussed in the brief show that one central reason for the uncle's abuse of Kelly was her LGBT status. And in fact, the findings of fact that I just read also support that conclusion and were never discussed in the BIA's opinion. The final form, way to infer a persecutor's motive is the form of the abuse on occasion. It's sort of rare that that occurs, but this case is one of those cases where that occurs. The uncle actually forcibly cut Kelly's hair, which was a big form of contention because growing her hair was a feminine trait and it didn't conform to the gender roles expected of Kelly as someone who was born male. And this is analogous to the Karouni case out of the Seventh Circuit, which is cited in our briefs, where a gay man was shot in the buttocks and the form of that persecution sort of gave insight into what was causing the persecution. Similarly here, cutting the hair showed that the failure to conform to masculine gender roles was part of the cause. How does the uncle's persecution play in on a deportation when, one, we don't know if the uncle's there anymore, and two, your client is an adult now, so your client doesn't have to be subjected to her uncle's abuse anymore. Presumably she can live wherever she wants if she's deported to Honduras. And I want to be clear that her future fear claim does not depend on the uncle's abuse. That's another error that the CIA made. So I know that from your briefing, but I mean, I just, I mean, we're talking about the uncle here, so I mean, how does that even play in? It seems like that's remote. She's not even a member of that potential class anymore of children who were abused or discriminated against because of being LGBTQ. It plays in a couple of ways. Number one, past persecution creates a rebuttable presumption of future persecution. No one's ever tried to rebut that presumption here. Do you have a case where that's true when it was a family member or someone in a custodial relationship that was doing the abuse? What if it was her dad instead or her mother that was beating her? I would say the same result. If it's past persecution and one central reason for that persecution is the PSG, which in this case it is, that creates a presumption of future persecution on that basis. Are you aware of a case though, where the asylum claim was based on persecution by your own family member? Can you repeat that question one more time? Are you aware of a case where the past persecution was based on abuse by a family member? Yes. I don't know that it's cited in our brief and I would have to do 28 J letters, but there are cases involving, for example, domestic violence, where asylum claims have been upheld because of the machista culture. But I'd be happy to submit that in a 28 J letter if your honor would like. That'd be great. Okay. We'll do. But the added nuance, in addition to that, is that the BIA said we need not decide the timeline of the respondent's identity as a transgender person because we alternatively agree with the IJ's conclusion that the respondent's LBGTQ or transgender status as a child does not appear to have been a central reason for her uncle's familial abuse. Correct. So assuming that there is past persecution that triggers a rebuttable presumption of current well-founded fear of future persecution, that rebuttable presumption no longer makes any sense because Kelly is no longer a child. In this case, your honor, it makes even more sense. Before I answer that question, I'd like to talk about another reason past persecution matters just on its own, which is that the INA is in the disjunct. It uses the word or. It's the word I'm, is the point I'm trying to make. It says past persecution or future persecution. So it is just relevant in and of itself. That being said, in this case, Kelly's claims of future persecution are even stronger because, number one, there's the evidence in, you know, the State Department reports multiple places where transgender people are completely unable to find employment. You know, that's not a problem when you're a child. It's a massive problem when you're an adult. And again, the evidence involving past persecution and future persecution is that the government is one of the key perpetrators of abuse against LGBTQ people. And as an adult, that is more likely to happen to you. You're more out in the world. But you have a disputed factual record as far as that goes. You have on one hand someone, an expert saying that the police and the government are the major persecutors. And on the other hand, you have a government that's passing legislation, providing training to officers, deploying a special police force to investigate crimes against a certain class of people. So, I mean, doesn't that create sort of a factual dispute that the BIA and the immigration judge was entitled to rely on? They could choose? I respectfully disagree with Your Honor's interpretation of the record as it being a disputed factual issue. Because if you look at both the expert report and the country conditions report, they make clear that although there are paper laws, that is in the record, they are not translating to on the ground protections for LGBTQ people. And not only those two reports, but multiple third party reports and newspaper reports in the record reflect the same. And those are unrebutted. So, for example, the state report itself says that security forces are perpetrating these abuses. In the very same paragraph where it talks about that law, it says security forces are perpetrating these abuses. Unrebutted evidence from the expert talks about public, brutal, frequent, systemic persecution of LGBT people and that they are among the most vulnerable people in society, particularly transgender women. And I would add, sort of back to our earlier point, that Kelly's future fear claim is even stronger than it was as a child because now she has begun transitioning. She has been taking hormones. She looks more like a woman and will have to navigate the world. She's quoted now talking about being transgender. You know, someone could do a Google search and find out she's transgender. She's living as a transgender person, which was not true of her as a child. One other thing I'd like to talk about on that pervasive persecution point is that it does show that the government is unable or unwilling to control. And that is because I disagree about the record being of two minds on that, I think it's of one mind, and it shows that where the police are involved, that to me should be dispositive, that the government is unable or unwilling to control this. Ask any tort lawyer, if your agent goes out and does something, do you then get to say, oh, I don't have any responsibility for that? No, you don't. That's your agent and they're the ones doing it. In fact, they're the primary persecutors, according to unrebutted evidence in the record. Do you agree that there's some evidence in the record that the Honduran government is trying to address the issue? I agree that there are laws on the record that are ineffective. Do you agree that there's been at least a prosecution in Honduras of someone for violating those laws? There has been a prosecution for murder, but again, according to the State Department report, very reliable unrebutted sources, over 90% of crimes, not just murder, crimes against LGBT people aren't even investigated, let alone prosecuted. Your Honors, unless you have further questions at this time, I'd like to reserve the remainder of my time for rebuttal. Okay, I do want to stop your clock so I don't need to end your rebuttal time, but I neglected to say at the outset that my respected colleague Judge McKay is listening in and participating fully. Judge McKay, my apologies for neglecting to mention that. Judge McKay, do you have any questions? No, I'm following the argument nicely from my chambers and appreciate the accommodation and I can hear clearly what's being said. I haven't any questions at the moment. Okay, and one of the other items that I neglected to mention, Judge McKay, is I want you to feel free to interject any of your questions. We'll all benefit greatly from those during the course of the argument. I've never been accused of being revesant about that. That's true. Thank you. Thank you, Your Honors. Thank you, Judge Bacharach. Thank you, Judge McKay. And we'll hear from the appellate. Thank you, Your Honor. May it please the Court. I'm Scott Stewart on behalf of the Attorney General. In this case, the agency denied petitioner's applications for asylum, withholding of removal, and protection under the Convention Against Torture. Those are fact-bound determinations on which the petitioner carried the burden here and did not carry it. To overturn those determinations, this Court would need to hold that the record compels the conclusion that they were wrong. The Court cannot reach that conclusion on this record and therefore should deny the petition. And you're just talking about the Kat claim? All the claims, Your Honor. Asylum, withholding, and Kat. Yes, to be clear on each of the issues, Your Honor. I think Judge Carson emphasized kind of a key theme and a very good point here about the issues on appeal are quite fact-bound. And we have before us a record that could support more than one conclusion, perhaps. And in that kind of a situation, the record does not compel a conclusion different from the one the agency reached. All right. Assuming that Kelly's never experienced past per- this is a big assumption. She's not experienced past persecution on behalf of a PSG. And that she does bear the burden in a vacuum to show a well-founded fear of future persecution. She does say that she fears as a transgender person that she fears persecution. She relies on the 2003-2017 country reports from Honduras. She relies on a lot of other documentary evidence that shows that there is widespread persecution, including perpetrated by law enforcement. So what exactly in Dr. Puello's report in some detail? So point me to something in the record that says there's a reason to question any of that. Sure, Your Honor. In the 2016 country report at page 461 of the administrative record, this is a part of that report that's addressing acts of violence, discrimination, and abuse based on sexual orientation and gender identity. The report does identify, look, there's a law that provides- that states that there is- that sexual orientation and gender identity merits special protection. There is still some discrimination, but there is action to show that the government is addressing these issues. There's a report of, yes, 218 cases of violent deaths since 2009, but there have been over a dozen convictions, and 171 of those cases still remain under investigation. And those convictions were for murder? I guess the word they use is violent deaths, Your Honor. I don't know. It's a death. It is violent. Right. Okay. Right.  Although it's been touted as one of the most progressive in the region, there's an extreme lack of political will and resources to implement it. The principal governmental institutions in charge of providing protection to children, and this is incidentally the excerpt that the IJ relied on, this part of the country report for Honduras, the principal governmental institutions in charge of providing protection to children are weak, highly bureaucratic, and in many instances perpetuate the cultural attitudes and norms that protect violence against children in the first place. Dr. Coelho goes on elsewhere to say that even for adults that LGBTI individuals face widespread and escalating violence by both the government and private actors. So do you have any documentary evidence, any testimony that says that anybody is enforcing this 2013 law in favor of LGBTI individuals or transgender individuals? Anything? I'm not aware of something specific to that 2013 law saying this is how this law is on the ground being implemented, Your Honor. Or that anybody in Honduras is doing anything to protect transgender people? Anything? I think it is that page of the country report, Your Honor. So just the law? I'm sorry. Well, investigations and prosecutions as well, Your Honor. Okay. So the 12 or 14 people have been prosecuted for killing people? Right, Your Honor. Several convictions and ongoing investigations as of that time. All right. Any evidence that anybody has been prosecuted without killing somebody, an LGBTI individual? I'm not sure about the granularity on that, Your Honor. If I find something, I can flag it for you. But I think the main piece is that. And I think it does provide, I mean, look, just that piece of the country report stood on similar footing with the Herrera Declaration. The court did treat that, he said it, the IJ said it, page 202. Look, that's going to be something about background country conditions. It's not specific to petitioner. I'll evaluate it. And the court did say, look, even this, as you know from the declaration itself, it's quite long and it is not complimentary. Not as well as the declaration? The Herrera Declaration, Your Honor. It's quite long and it's not complementary of the Honduras government. But the IJ pointed out, look, even the Herrera Declaration recognized a government willingness to prevent child abuse in all children. So there was that willingness. That does provide a basis there. And the BIA did go on to say, this is at page four, that he agreed with kind of the IJ's analysis on this. And who I think, my friend pointed out that, look, the IJ acknowledged different features in here. And I think that really shows the even-handed and very sensitive treatment that the IJ gave to the rather searing facts presented in the case. The problem is that the IJ was relying on an excerpt saying that the 2013 report law protects transgender children. And the IJ neglected to mention the very next sentence in the declaration, which says that although there is this 2013 law on the books, nobody's enforcing it. I just read it. Let me make sure I have the exact point on which you're focusing on the IJ's opinion, Your Honor. That's the only thing that he relied on. Well, I mean, I think, again, it comes back to the two things, Your Honor, because it's both about willingness and ability. And the IJ began with the laws regarding child abuse and saying, look, we have a situation where the petitioner as to future harm is not really able to point to this is the exact person who will persecute me. It's kind of abstracted away from the uncle and is zooming out to broader conditions. So the IJ sees that and says, well, look, I see these laws. These laws are aimed at providing protections to this vulnerable population. That supports a conclusion that there is a willingness to address this. Then the IJ goes down, this is on page 98 of the record within the IJ's opinion, to look at the investigations and convictions to support, look, there is a government ability to address this. The IJ certainly didn't proclaim that this is perfect or anything like that. But when you have a situation, Your Honor, where the petitioner can't really point to something very, very concrete and you're looking at competing general conditions, the IJ here very permissibly and reasonably said, look, I think that this is the better view of the evidence here, that the government is willing and able. So it's one of those points that I think Judge Carson was kind of homing in on, where you have evidence going both ways. The IJ has this before him or her and can reach either one of the conclusions. And there's just not a basis to disturb that at that point. So I do take your point, Your Honor. It's certainly, I think, the agency was sensitive to the imperfections here. But given kind of the more generalized nature of future harm, this was a reasonable conclusion. Do you think a fair record or a fair reading of the record is, is that culturally there is a lot of discrimination in Honduras? I think that there is, there's certainly evidence to support discrimination, particularly against this group. I think the Herrera Declaration... Against this class. Every time I start spouting out the letters, I get tongue-tied by the So what do you do if you have a situation where the, where the discrimination is so widespread that the government, even though they may have a willingness to address it, just physically can't keep up with, with the discriminate, with the discrimination? I mean, I think the law does recognize either that specific threat, a specific threat situation, or the pattern or sort of systemic pervasiveness, Your Honor. And I don't think we're quibbling that a sufficiently, we're not disputing just standing here today that, you know, that pattern or systemic abuse could satisfy, could be a permissible showing that's made. What we're saying here is that there just is not potent enough evidence. It's one of those things where, again, as I was, as I was noting in the colloquy with Judge Bacharach, when you don't have much in the way of specific evidence as to the person, what they did, how the government responded, were they able to do anything? It becomes hard because you have to rely on these more generalized statements. I believe, my friend, I believe argued on the First Circuit, about the First Circuit's decision or relied on the First Circuit's decision in Rosales-Justo, which involved a situation where, I believe, as I recall, the First Circuit rejected, said like, look, even if somebody was, government was willing to help, they weren't able here. You know, they did a little bit of investigating, but they really couldn't protect people. But it was pretty specific as to that petitioner because there they actually went to the government and tried to get some help. Here we have the situation, and this appears a bit on the transcript at, I believe, pages 219 and 237. On the 219 piece, this is, of course, the petitioner's testimony. This is where the petitioner's homing in on, did you go to the police? What did you do? And she said, no, I wasn't able to. I didn't know that anybody could help me. I saw other children going through things. Where is it, on 219? Yeah, the first half, Your Honor. And what about the police? Yeah, yeah. And then 9 through 11 is, I think, one of the more concrete statements from the petitioner regarding the police. So when she was nine, she didn't know to go to the police, right? I think at that age, she didn't know that anyone could help her, didn't know anything about it. And look, we don't want to overly fault somebody for that, but it does get at this absence of concrete evidence as to what the authorities may have done or would have done or would have tried to do if they had been presented with somebody who was being beaten numerous times a week. So help me. I'm just not following you. So when she's like nine or 10, she doesn't know to call the police to say my uncle is beating me six times a week, calling me a faggot. And so from that, we would infer that now that she's 22 or 23, that she doesn't face a well-founded fear of future persecution because she testified that when she was a child, she didn't know to call the police? No, Your Honor. I think I'm focusing more on what we know about what the government is willing and able to do. And the evidence that the petitioner has put on about how the government's willingness relies on those broader country reports mostly. Well, and what you alluded to earlier, the declaration, which is essentially the only thing that the Honduran government is applying that law. But again, it's in the nature, as the IJ noted, of background country conditions. And therefore, it's not specific to the petitioner. And what I'm simply pointing out here on this, this is 219 and 237, Your Honor, is we have this absence of concrete specificity from the petitioner. The petitioner doesn't have kind of a firsthand look. I went to the police. Here's what happened. Or I went to the police. Here's what didn't happen. So all we have is this more general competing considerations about how to weigh the evidence. And that's really an agency determination. The agency is really best situated to pull apart, was the government willing or unable? What would happen? Those kind of things. That's the point I'm getting at, Your Honor. What if the testimony was, when I was nine, being beaten by my uncle, there was a policeman, and I went to him and said, hey, my uncle's beating me and calling me all these names. And the policeman said, go home. I'm not going to do anything about it. Does that change anything for you? I mean, that's a specific example. It would provide more support, Your Honor. And I think courts often reach, I think, different, I think we see courts reach different conclusions when you have that kind of firsthand account. And you say, oh, okay, the police here didn't take that seriously because it really homes in on, this is how somebody responded to that. So I think it just... My concern with what you're telling us is that the petitioner here would have to, basically has to go get beat up and ask the police to do something and then say no before she can have a reasonable fear of persecution. I don't think so, Your Honor. I think all we're saying is that not to adopt any sort of per se rule. What we're really saying is that it's a fact-bound question. The petitioner does have the burden. The agency ruled against the petitioner on that fact-bound question. And given that, and given the lack of, say, that kind of concrete evidence or evidence of more just pervasive harm, the record just doesn't compel reversal of the agency's decision. I see that I'm over time. Thank you, Your Honor. Judge McKay, do you have any questions? None at this point. Okay. Thank you very much, counsel. Thank you, Your Honor. Thank you, Your Honors. Quickly, on your question, Judge Carter, about sort of de jure versus de facto and which one governs, I'd encourage the court to read the Ninth Circuit's decision in Avenato-Hernandez, which is cited at 33 of our opening brief. It discusses that issue a little bit. The other case that I think really is highlighted by the government's argument and really goes to the issues in the case is this court's Carkey decision. That decision made crystal clear that the BIA needs to consider the record as a whole, and it needs to, you know, address contrary evidence and explain why that contrary evidence is not sufficient in this case. I would submit that the BIA did neither here. With regard to the expert's declaration, I just encourage the court to read paragraphs 33 through 40 of that declaration. And if you come away thinking, gee, there's no, that law is really protecting transgender people, then we just have different reading comprehension, I think. It's not what that report says in any manner. The report is extremely clear that there's widespread discrimination. And at minimum, I think under Carkey, the court has to remand and make the BIA do its job and explain why that's not right and why it's rejecting that evidence, which it didn't even bother to mention. Not only did it not bother to mention the very evidence it's talking about, you know, also look at the entirety of the country conditions reports. The country conditions reports are very clear that, you know, there are very serious dangers, including inability to be employed, essentially, if you are a transgender person. And that was not even discussed. The educational issues were not even discussed. Now, let me ask you about the educational persecution. You know, obviously, that would have been an argument, is an argument, a good argument, for when someone's a child. Now that someone's 23, the inability to go to a public school probably really is no longer applicable. The consequences of that are still very applicable, Your Honor. Well, the consequences. But, you know, what we're talking, as you pointed out in your first presentation, we're talking about past persecution only insofar as it creates a rebuttable presumption of a well-founded fear of future persecution. I disagree with that, Your Honor, because the statute is an or. So past persecution or. Well, under the third prong, if it is so severe, right, that trumps everything. I read in vain in your blue brief or your reply brief to make an argument that the past persecution was so severe that we don't even have to look at a well-founded fear of future persecution. Your Honor, we did discuss past persecution as a standalone or certainly intended to. You certainly mentioned that that is one of the three segments of the disjunctive in the statute. But in any event, assuming that, putting that aside, as far as a trigger point for a well-founded fear of future persecution, how is educational persecution when Kelly had been qualified otherwise to attend a public school, how is that relevant as a window into future persecution? Because it contributes to, first of all, the employment issues that are already pervasive. You know, if you can't get a job generally, you certainly aren't getting one when you haven't had even a basic education. It also shows general societal and government attitudes towards transgender people. And I see that my time has run out. I don't want to belabor the point, but I just ask your honors, please, to the extent you can prioritize this case, do so. She's been in detention 924 days as of today, ice custody. Can I ask, and I know your time's at the last minute, one question. I just want to make sure I know what your asylum request is. Since asylum is a discretionary remedy, you're not asking us to grant the petition review and direct the BIA to grant asylum, are you, or are you? Correct. You're just asking us to say that there was either sufficiently severe past persecution or that there was sufficiently, that no adjudicator could do otherwise than to find a well-founded fear of future persecution, right? Correct. Okay. It's sort of off topic, but can I ask it? So are you pro bono counsel? Yes, your honor. Okay. I thought so, and I just wanted to thank you for that. Thank you, your honor. It's nice to get people to volunteer their time and do such a great job. It's been very helpful. Thank you, your honor. And I'm here with the National Immigrant Justice Center who does terrific work, and I'd like to pass that thanks on to them. Thank you. A few times I agree with you. Thank you, your honor. You did an excellent job, and we appreciate your participation. But before I let you sit down, Judge McKay, do you have any questions? No, I have none. I think the arguments are well focused. Thank you, your honor. All right. Thank you. Both sides did an excellent job. We appreciate your excellent advocacy. This matter is submitted.